# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LINDA S. PARKS, Trustee,
CENTRAL PLAINS STEEL CO., and
SALINA STEEL SUPPLY, INC.,

*Appellants*,

vs.

BRUCE EARL ANDERSON - Debtor,

*Appellee.*

Case No. 08-1111-EFM

Consolidating
Case No. 08-1112-EFM
Case No. 08-1113-EFM

## MEMORANDUM AND ORDER

Appellants Linda S. Parks, Trustee ("Parks"), Central Plains Steel Co. ("Central Plains"), and Salina Steel Supply , Inc. ("Salina Steel") bring this appeal from the United States Bankruptcy Court for the District of Kansas, Case No. 05-19222, against Appellee Bruce Earl Anderson ("Anderson"), in which the Bankruptcy Court ruled that 11 U.S.C. § 522(p)(1) does not apply to a debtor who purchases a homestead outside the 1,215 day period preceding the bankruptcy filing but pays down the mortgage in excess of $125,000 during the 1,215 day period.  Central Plains and Salina Steel also appeal from the bankruptcy court's ruling that Anderson's conversion of a non-exempt asset into an exempt asset was not done with the intent to hinder, delay, or defraud creditors under § 522(o), and that Central Plains has no claim against Anderson or his bankruptcy estate and is not a creditor in this case.  For the reasons set forth below, this Court overrules the bankruptcy

-1-

court's order with respect to the homestead exemption claim under 11 U.S.C. § 522(p)(1), and sustains the bankruptcy court's order on the remaining claims.

## I. Procedural Background

Parks filed a Motion for Summary Judgment on July 27, 2007, objecting to Anderson's claim of a homestead exemption under 11 U.S.C. § 522(p)(1).[1]  Salina Steel and Central Plains joined in Parks' objection.[2]  Anderson subsequently filed his response and a cross-motion for summary judgment on August 27, 2007.[3]  On October 2, 2007, the bankruptcy court issued its Order, which denied Parks' Motion, and granted summary judgment in favor of Anderson on Parks' objection to Anderson's homestead exemption based upon § 522(p)(1).

Salina Steel and Central Plains also objected to Anderson's homestead exemption claim based upon 11 U.S.C. § 522(o).[4]  On November 13, 2007, the bankruptcy court held an evidentiary hearing on the objection, taking the matter under advisement.[5]  On April 11, 2008, the bankruptcy court issued its Order in which it held that Central Plains could not pierce the corporate veil so as to permit it to pursue its claim against Anderson in his individual capacity; therefore, Central Plains was not a creditor in this bankruptcy and has no valid claim against Anderson or his bankruptcy estate.[6]  The court further held that Anderson did not act with the intent to hinder, delay, or defraud

---

[1]Bankr. Doc. 249.

[2]Bankr. Docs. 66, 70.

[3]Bankr. Docs. 258-59.

[4]Bankr. Docs. 66, 70.  Parks also objected to Anderson's homestead exemption claim based upon 11 U.S.C. § 522(o), but subsequently abandoned her claim.  Bankr. Docs. 21 ¶ 6, 245.

[5]Bankr. Doc. 290.

[6]*In re Anderson*, 386 B.R. 315, 327 (Bankr. D. Kan. 2008).

his creditors, and accordingly, overruled Salina Steel's objection to Anderson's homestead exemption claim.[7]

As a result of the bankruptcy court's rulings, on April 22, 2008, Parks, Salina Steel, and Central Plains each filed a Notice of Appeal with this Court.[8]  On June 27, 2008, Parks filed a Motion to Consolidate the cases, which the Court granted.

## II. Factual Background

Although the parties have not stipulated to the facts in this case, after reviewing the record and the parties' briefs, the Court finds the bankruptcy court's factual findings accurate and supported by the record, and accordingly, adopts its factual summary.[9]

### Facts Pertaining to the Claims

Anderson owned several entities. His principal business was the manufacture and sale of lifts for storing and servicing automobiles.  Aerotech Designs, Inc. ("Aerotech") manufactured the lifts and Auto Lifters of America, L.L.C. ("Auto Lifters") marketed them.[10]  Anderson also owned a business called U.S. Credit L.L.C., which financed the purchase of equipment used in manufacturing the lifts. Anderson owned all or a controlling share of the stock or equity in each of these entities. He held all of the executive offices of each entity and was the only director. Aerotech was organized in 1991 and its manufacturing facility was located in Newton.  Auto Lifters was organized in 1989, and its business office was located in Andover.  Prior to 1989, Anderson ran a lift business, apparently as a sole proprietor doing business as Auto Lifters.  Aerotech and Auto Lifters ceased operations in late April of 2005.  Anderson also owned an unrelated entity called Park City Investors, L.L.C., a company that acquired and sold real property in Park City, Kansas.

_____

[7]*Id.* at 331-32.

[8]Each Appeal was filed under separate case number (Parks: 08-1111, Salina Steel: 08-1112, and Central Plains: 08-1113).

[9]The bankruptcy court's factual summary is derived from its opinions in *In re Anderson*, 374 B.R. 848 (D. Kan. 2007) and *In re Anderson*, 386 B.R. 315 (D. Kan. 2008).  Footnotes have been added by this Court.

[10]The bankruptcy court noted that Auto Lifters was a debtor in a chapter 7 case filed in its court, case no. 06-10071.  Aerotech Designs was an alleged debtor in an involuntary case filed in 2005, case no. 05-19160, which was closed without the entry of an order of relief.

Central Plains began selling steel to Anderson in 1985. Central Plains began by invoicing Auto Lifters, but by the time the lift business folded in 2005, [Central Plains] was invoicing Aerotech. Central Plains' credit manager testified that he did not really differentiate between the two entities, and that he knew Anderson owned both. After Auto Lifters and Aerotech went out of business, Central Plains sought and obtained a consent judgment in the principal amount of $162,392 against the two companies on August 2, 2005 in the District Court of Sedgwick County, Kansas. There is no contract, guaranty, or other writing shown that would support a contractual relationship of any kind between Central Plains and Anderson individually or personally.[11] Central Plains asserts a claim of $172,403.41 for steel sold from January to April of 2005.

Salina Steel also has a judgment. It was entered November 9, 2005 against Auto Lifters for steel sold in the amount of $188,232 in the District Court of Saline County, Kansas. More importantly, Salina Steel asserts an individual claim against Anderson based upon his execution of a guaranty on October 22, 2004. Salina Steel's credit manager testified that she obtained a security interest in the steel Salina Steel shipped to Aerotech and Auto Lifters on October 22, 2004 and, at the same time, obtained personal guaranties from Anderson and his son, Cameron Anderson, who managed the plant. In general, Salina Steel invoiced Auto Lifters but received payment from Aerotech for its product. Salina Steel asserts a claim of $188,232.62 for product sold February 15, 2005 to April 21, 2005 on account to Auto Lifters and guaranteed by Anderson.

### Facts Pertaining to the Disposition of Anderson's Non-Exempt Real Estate Assets

Prior to 1998, Anderson found a six acre tract of land north of Wichita at 61st Street and I-35 highway that had commercial development potential. With his brother-in-law, Tony Udden, he formed Park City Investors, L.L.C. ("PCI") to acquire and hold this land for resale. In 1998, PCI sold part of the tract to CBOCS West, Inc. for $569,000. CBOCS erected a Cracker Barrel Restaurant on that site. According to the seller's statement for this transaction, from these proceeds, Anderson received $138,418 representing funds he had loaned to PCI. After other deductions, the net payout to PCI was $332,331.79. From that amount, PCI bought and paid for two houses on or adjacent to the Cracker Barrel site for $122,387. PCI also moved four houses off the Cracker Barrel tract and sold them at auction for $36,295. Of the auction amount, PCI retained $10,000. Anderson and Udden split the net of the CBOCS sale proceeds after paying for the two houses.

---

[11]As the bankruptcy court correctly noted, any standing that Central Plains has in this case is predicated on its being able to pierce the corporate veil of these entities to hold Anderson personally accountable for their debts.

Shortly thereafter, Udden declared bankruptcy and, in July of 1998, PCI redeemed Udden's membership leaving Anderson the sole member of PCI. To redeem Udden's membership, PCI purchased land in Andover, Kansas to convey to Udden in a tax-free exchange for his interest in the company. The redemption agreement was signed and closed in July and the land purchase and trade was accomplished in September of 1998. In order to effectuate this transaction, PCI needed $220,000. Anderson testified that his accountant advised that a loan be taken out of Auto Lifters. He withdrew the money from Auto Lifters in an undocumented loan to him as a shareholder. This loan was never repaid. There is no dispute that Anderson controlled Auto Lifters and caused this loan to be made.

Then, in April of 2002, PCI made an agreement to sell the remainder of the initial PCI investment property to Hattan Properties, L.L.C. When this transaction closed, PCI received the gross price of $484,887. Net proceeds to PCI were $444,749.42. Of this amount, Anderson distributed $219,000 to Auto Lifters. In June of 2002, Auto Lifters transferred that amount back to Anderson who funded two certificates of deposit at Conway Bank, each in the amount of $100,000.[12]

When Auto Lifters and Aerotech began to lose money after 2003 and incur difficulties maintaining vendor payments, Anderson cashed one of the CDs and, in March of 2005, obtained a personal line of credit of $100,000 from the Citizens State Bank of Hesston, secured by a $100,000 CD at that bank and acquired with the proceeds of the Conway Bank CD. Anderson drew $75,000 down on that line and disbursed the loan proceeds to Aerotech ($50,000) and Auto Lifters ($25,000) during 2005.

The balance of the proceeds of the second PCI sale were paid to Bruce Anderson ($20,000), to Bruce and Lana Anderson ($53,000 for taxes), and to U.S. Credit ($150,000). Lana Anderson is Bruce's wife. She is a practicing dentist and is not a debtor in this proceeding. On November 8, 2002, U.S. Credit paid Aerotech $100,000 as a loan. Auto Lifters also deposited $20,000 in Aerotech's account that day. Aerotech never repaid the $100,000 U.S. Credit loan.

PCI sold its remaining Park City property in April of 2002 to Hattan Properties and received $139,227.25. This sum was used to purchase Sumner County real property that was like-kind exchanged and sold, resulting in the deposit of $106,831.82 in PCI's Intrust Bank account in November of 2003, of which $96,287.27 were disbursed to Bruce Anderson on September 20, 2004.

In July of 2005, Anderson sold a tract of land in Newton, where the Aerotech manufacturing facility had been located, to Robert Coleman. Coleman paid

---

[12]The bankruptcy noted that no proof was presented concerning the fate of the other $19,000.

$150,000 for the land and $50,000 for the equipment. Because the equipment was pledged to Citizens State bank of Hesston, it received $8,600.  A Newton bank holding the mortgage on the land received about $71,000.  After other deductions for costs and taxes, Anderson received $115,734.61.  At least part of this amount he deposited into an account at Capital Federal Savings, his home mortgage lender.

The Hesston bank paid the balance of its line of credit to Anderson with his pledged $100,000 CD and refunded him $33,368.64.  This amount, along with the proceeds of the remaining Conway Bank CD mentioned above, $107, 385.21, were deposited in the Capital Federal account.

Thus, it appears to the Court that non-exempt assets of $240,000 were converted to Anderson's exempt homestead.  Those non-exempt assets included (1) the Conway Bank $100,000 CD acquired in 2002 with proceeds from the second PCI real estate sale; (2) the $115,000 net proceeds from the sale of the Newton facility and property in July of 2005; and (3) the $33,000 proceeds remaining of the $100,000 CD used to secure the Hesston Bank $100,000 line of credit.

### Anderson's Home

In December 1998, Anderson and his wife purchased a large home that abuts the north golf course at Crestview Country Club in East Wichita for $350,000.[13]  The Trustee's appraiser valued this property at $636,000.[14]  The home is subject to a substantial mortgage held by Capitol Federal, and, on July 18, 2005, shortly before this case was filed, Anderson paid Capitol Federal $240,000 by debiting his Capitol Federal account.[15]  According to the schedules filed in this case, Capitol Federal is owed approximately $170,000 after receiving the $240,000 payment.   In his bankruptcy filings, Anderson claimed the home exempt and scheduled the value of the home at $411,800.[16]   Anderson significantly increased the equity in his homestead by making this transfer and did so from funds that would have been otherwise available to his creditors in this case.  When directly questioned by the [bankruptcy court] about his motivation in making this payment, Anderson stated, "I don't know."

---

[13]The original mortgage on the property was held by the Midland National Bank in the amount of $375,000.  Anderson and his wife refinanced the property on or about November 22, 2000 with Capital Federal Savings, executing a note and mortgage for $500,000.  The appraised market value of the property at the time of refinance was $650,000.  Anderson and his wife hold the property as joint tenants with right of survivorship.

[14]The trustee's appraisal was completed after Anderson filed this bankruptcy in 2005.

[15]Anderson filed his petition for chapter 7 bankruptcy relief on October 14, 2005.

[16]Anderson's value was based on the 2005 ad valorem tax valuation.

**Anderson's Conduct of the Businesses**

Anderson did not conduct the day to day management of his companies, but he did exert significant control over their financial and business affairs. As noted above, he owned a controlling or absolute interest in all of them. He was the sole director or member of each entity and held all executive or managerial positions. Auto Lifters and Aerotech were both incorporated with the assistance of an attorney. Anderson conceded that after preparing the organizing documents and minutes for Auto Lifters and Aerotech, he did not conduct shareholder or director meetings, nor did he prepare and maintain minutes of annual meetings. Auto Lifters and Aerotech did file tax returns and corporate annual reports every year. Auto Lifters and Aerotech also maintained separate books and records and separate bank accounts.

Both Aerotech and Auto Lifters operated on thin capital. Anderson initially paid in about $66,000 in capital to Auto Lifters and that amount remained stable throughout the life of the company. According to the Auto Lifters' tax returns, the company's retained earnings were greater than zero until 2004. While the shareholders' equity continued to diminish throughout this period, Anderson denied that he thought the company was "struggling." He attributed its difficulties to Chinese competition and the increased cost of materials ( e.g. powder coating finish). By 2004, Auto Lifters had a considerable order backlog of over 100 lifts. It was unable to procure the components to complete the lifts in work-in-progress. Auto Lifters had accepted orders and credit card deposits from numerous customers but was unable to deliver goods. Intrust Bank cleared credit card deposits for Auto Lifters and eventually sued the company for over $200,000 it paid as a result of this backlog.

However, in 1998, when PCI "borrowed" the $220,000 to redeem Udden's interest, Auto Lifters was comfortably solvent. Even after the loan was made, the company had retained earnings of over $100,000. By the end of 2002, that amount had dwindled to about $34,000. By the end of 2003, retained earnings had plummeted to [negative] $248,000. There is nothing to suggest that Anderson made the PCI loan in 1998 with no intent to pay it back other than the fact that on several occasions, PCI had more than sufficient funds to do so and did not. It is significant that from July 15, 2004 to March of 2005, Aerotech continued to pay both Salina Steel and Central Plains (and many other suppliers) on some of their invoices. Anderson historically received salary from both companies but does not appear to have taken extraordinary draws in this period. When the companies began to experience financial difficulties in 2004, Anderson ceased taking a salary. He personally borrowed money, secured in part by the Conway Bank CD acquired with PCI real estate sales proceeds, to fund the operations of the companies.

Anderson has a high school education, sixteen credit hours of college and is a retired fireman. He does not appear to have had any formal business or accounting

training.  He testified that after his businesses closed in July of 2005, he suffered, and continues to suffer severe depression.  Anderson has not worked since.  At the time of trial and during the discovery period, he was taking Xanax and Zoloft for that malady.  He did not demonstrate much intimate familiarity with any of the details of his businesses, leading the Court to suspect that he was intellectually overwhelmed by the responsibility of dealing with three or four separate entities.  After Udden left PCI, Anderson appears to have been the only equity holder in each of these entities, assisted only by his son, Roland Boesker, plant managers, and his bookkeeper.

Anderson fully disclosed the conversion and transfers noted above in his Statement of Financial Affairs.

### III.  Standard of Review

"On appeal from the bankruptcy court, the district court sits as an appellate court."[17]  A district court reviews a bankruptcy court's factual findings for clear error, and reviews its conclusions of law de novo.[18]  The district court may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree, or remand with instructions for further proceedings.[19]

Appellants' objection to Anderson's homestead exemption claim is an issue that pertains to statutory interpretation, for which this Court's review is de novo.[20]  Further, the bankruptcy court determined that Auto Lifters and Aerotech were not Anderson's alter ego, a finding of fact, and accordingly, we review that determination under the clearly erroneous standard.[21]  Lastly, "a bankruptcy court's finding of fraudulent intent on the part of a debtor is a finding of fact, rather than

---

[17]*In re Barber*, 191 B.R. 879, 882 (D.Kan. 1996).

[18]*Zions First Nat'l Bank, N.A. v. Christiansen Brother, Inc.*, 66 F.3d 1560, 1563 (10th Cir. 1995).

[19]Fed. R. Bankr. P. 8013.

[20]*In re Lanning*, 545 F.3d 1269, 1274 (10th Cir. 1269).

[21]*Floyd v. I.R.S.*, 151 F.3d 1295, 1298 (10th Cir. 1998) (citing *G.M. Leasing Corp. v. United States*, 514 F.2d 935, 939 (10th Cir. 1975) (court's finding of alter ego status "presumptively correct and must be left undisturbed on appeal unless . . . clearly erroneous"), *rev'd in part on other grounds*, 429 U.S. 338 (1977).

a conclusion of law," and therefore, we apply the clearly erroneous standard.[22]  For a factual finding to be clearly erroneous, it "must be more than possibly or even probably wrong; the error must be pellucid to any objective observer."[23]

## IV.  Analysis

This appeal concerns whether the bankruptcy court erred in finding: (1) that 11 U.S.C. § 522(p)(1) does not apply to a debtor who purchased a homestead outside the 1,215 day period preceding the bankruptcy filing but pays down the mortgage in excess of $125,000 during the 1,215 day period; (2)  that there was no justification to warrant piercing the corporate veil, thereby precluding Central Plains from proceeding with a claim in this bankruptcy; and (3) that Anderson did not convert non-exempt assets to exempt assets with the intent to hinder, delay, or defraud his creditors.  The Court addresses each in turn.

### *Homestead exemption under 11 U.S.C. § 522(p)(1)*

As the bankruptcy court noted, the resolution of this issue turns on the interpretation of "interest" as referenced in 11 U.S.C. § 522(p)(1), and the nature of the interest *acquired* during the 1,215 day period preceding a bankruptcy filing.   Section 522(p) provides in pertinent part:

> (1) Except as provided in paragraph (2) of this subsection and sections 544 and 548, as a result of electing under subsection (b)(3)(A) to exempt property under State or local law, a debtor may not exempt any amount of interest that was acquired by the debtor during the 1215-day period preceding the date of the filing of the petition that exceeds in the aggregate [$125,000][24] in value in -

---

[22]*In re Sayler*, 98 B.R. 536, 538 (D. Kan. 1987).

[23]*Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1161 (10th Cir. 2007) (quoting *United States v. Cardenas-Alatorre*, 485 F.3d 1111, 1118-19 (10th Cir. 2007)).

[24]For cases commenced on or after April 1, 2007, the dollar amount is $136,875.

(A) real or personal property that the debtor or a dependent of the debtor uses as a residence.

. . .

(2)(B) For purposes of paragraph (1), any amount of such interest does not include any interest transferred from a debtor's previous principal residence (which was acquired prior to the beginning of such 1215-day period) into the debtor's current principle residence, if the debtor's previous and current residences are located in the same State.[25]

The bankruptcy court concluded that the term "interest" refers to title or ownership of a homestead and not equity, thereby permitting Anderson to claim as exempt the $240,000 he transferred into his mortgage within the 1,215-days preceding his bankruptcy filing. The bankruptcy court reached its decision after conducting its own independent research, which included review of authoritative bankruptcy treatises, and the cases cited by the parties.

On appeal, trustee Parks, Salina Steel, and Central Plains argue that the bankruptcy court improperly interpreted the language of 11 U.S.C. § 522(p) in finding that the term "interest" refers to title. Parks argues that the statute's language is unambiguous and is "broad enough to include equity that the Debtor acquires during the 1215 days before bankruptcy."[26] The phrases "any amount of interest," "value," and "in the aggregate" each refer to a quantitative interest that is more consistent with equity than with title. Moreover, Appellants argue that a homeowner cannot acquire an "amount of title," nor can a homeowner accrue title "in the aggregate." Parks further asserts that the term "interest" in § 522(p)(2)(B) refers to equity, and based on principles of statutory construction, suggests that "interest" in (p)(1) also means equity. Parks contends that to interpret

---

[25] 11 U.S.C. § 522(p).

[26] Doc. 10, p. 9.

"interest" otherwise would leave § 522(p)(2)(B) incomprehensible, which is a result that Congress would not have intended.

Both Salina Steel and Central Plains posit the additional argument that "interest" pertains to an active acquisition of equity, which includes a debtor's act of substantially paying down a mortgage prior to filing for bankruptcy.

Appellants rely on *In re Rasmussen*[27] to support their arguments. Appellants argue that the bankruptcy court in *Rasmussen* correctly interpreted "interest" to mean acquisition of equity rather than an ownership interest. The bankruptcy court in the instant matter, however, disagreed, and found *Rasmussen* to be readily distinguishable from the instant matter on its facts. Although *Rasmussen* dealt with debtors who purchased their homestead within the 1215-day period preceding their bankruptcy filing (rather than, as in this case, a homestead purchased outside the 1215-day period), we find the court's analysis and interpretation of the terms within § 522(p) are nevertheless, instructive.[28]

The *Rasmussen* court addressed the question of whether the monetary cap set forth in § 522(p) applied to an increase in a homestead's value due to appreciation during the 1215-day period. In answering that question, the court had to determine whether that "interest" acquired by the debtor counted toward the statute's $125,000 cap, thereby requiring the court to determine the meaning of the term "interest." Citing *In re Sainlar*[29] and *In re Blair*,[30] the *Rasmussen* court concluded that an

---

[27] 349 B.R. 747 (Bankr. M.D. Fla. 2006).

[28] While the facts of a particular case may cause a court to vary its application of a statute, the meaning of terms within that statute will not change.

[29] 344 B.R. 669 (Bankr. M.D. Fla. 2006). The Court notes that *Sainlar* was decided six months prior to *Rasmussen* in the same bankruptcy court, but by a different bankruptcy judge.

[30] 334 B.R. 374 (Bankr. N.D. Tex. 2005).

increase in value due to appreciation during the 1215-day period was not an "interest" acquired under § 522(p), and overruled the trustee's objection to the debtor's exemption.[31] While *Rasmussen* agreed with the ultimate holdings in *Sainlar* and *Blair* based on the facts of each case, the court disagreed with those decisions in that each interpreted the "interest" acquired by a debtor as an ownership interest.[32] Instead, the *Rasmussen* court determined that "interest" meant equity acquired in the homestead during the 1215-day period.[33]  In support of its conclusion, the court referred to the same language used in § 522(p)(2)(B):

> This conclusion is buttressed by the use of the same phrase "any amount of interest" . . . in section 522(p)(2)(B): "For purposes of paragraph (1), *any amount of such interest* does not include any interest transferred form a debtor's previous principal residence . . . into the debtor's current principal residence . . . ."  11 U.S.C. § 522(p)(2)(B) (emphasis added).  This second use of the term "interest" can only refer to the equity in the prior residence that is rolled into the current homestead.[34]

 The court further reasoned that because a term used within the same section must be given the same definition, "amount of interest" in both 522(p)(1) and 522(p)(2) must refer to equity.[35]

The court in *Rasmussen* also disagreed with the *Sainlar* court's interpretation of "acquired by the debtor."  Although *Rasmussen* agreed that "acquired" means "obtained as one's own," it disagreed with *Sainlar's* application of the phrase to only the acquisition of title or ownership.  The *Rasmussen* court decided that a debtor may acquire equity in one of three ways.  A debtor may acquire equity by making a down payment, paying down a mortgage, or through appreciation due

---

[31]*Rasmussen*, 349 B.R. at 756.

[32]*Id.*

[33]*Id.*

[34]*Id.*

[35]*Id.*

to market conditions.[36]  The first two require active conduct by a debtor, while the latter does not.

The court explained that the phrase "by the debtor" is a restrictive clause modifying the term

"acquired," which implies that more than a passive acquisition of equity was required to trigger the

provision, such as the affirmative act of a mortgage pay down.[37]  The court also addressed the phrase

"aggregate of $125,000 in value," stating that the phrase "implies that successive acquisitions of

equity by the debtor are to be aggregated,"[38] further supporting its reasoning that "interest" applies

to equity and not to fee ownership.

Appellants also cite a Fifth Circuit Court of Appeals decision, *In re Rogers,*[39] in support of

their position.  *Rogers* was an appeal from the northern district of Texas[40] in which the district court

defined "interest" within section 522(p)(1) as equity, thereby affirming a Texas district court

decision overturning a bankruptcy court's holding that "interest" meant fee title.[41]  The issue before

the appellate court, however, was whether § 522(p)(1) applied to a homestead interest established

---

[36]*Id.* at 757.

[37]*Id.*

[38]*Id.*  The *Rasmussen* court provides the following example of aggregating value: "[I]f a debtor within the 1,215-day period purchased a home for $750,000, paying $100,000 down and financing the balance by a bank mortgage and then a month after the purchase paid off the $650,000 mortgage, the amount of equity acquired by the debtor's affirmative acts of paying $100,000 down at the time of purchase and then paying off the $650,000 mortgage would be aggregated.  In this example, the debtor's permitted exemption of $125,000 will have been exceeded by $625,000."  *Id.*

[39]513 F.3d 212 (5th Cir. 2008).  This Fifth Circuit opinion in *In re Rogers* was published over a year after the bankruptcy court in the instant matter decided the issue that is presently before this Court.  At the time the bankruptcy court below issued its opinion, the only appellate decision construing § 522(p)(1) and the term "interest" was *In re Khan*, 375 B.R. 5 (B.A.P. 1st Cir. 2007).  *In re Khan* was an appeal from the district of Massachusetts bankruptcy court in which the issue was whether real property conveyed by a trust to the debtor within the 1,215-day period was subject to the statutory limit imposed by § 522(p)(1).  The B.A.P. held that because debtor acquired the property from the trust within the look-back period, it was subject to the monetary cap.

[40]*In re Rogers*, 354 B.R. 792 (N.D. Tex. 2006).

[41]*In re Rogers*, 513 F.3d at 217-18.

within the 1,215-day period when the debtor acquired title to the property before that period, the answer of which did not turn on the meaning of "interest."[42]  Nevertheless, the court conducted an analysis on the term's meaning, and, although not part of its holding, noted that a court's adoption of the fee title definition of "interest" is "an easily-applied rule that is arguably in conflict with the statutory language indicating that the term "interest" refers to a quantitative or monetary value," or, equity.[43]

Anderson counters by arguing that § 522(p) does not apply to equity acquired within the 1,215-day period preceding a bankruptcy filing, but instead applies to an ownership interest acquired within that time period.  Anderson contends that because equity cannot be acquired, the terms used within the section can only lead to the interpretation that "interest" means title, which a person can acquire.  Moreover, Anderson asserts that Congress provided a method for creditors to challenge fraudulent mortgage payments during the 1,215-day period by enacting the fraudulent transfer provision in § 522(o), and if "interest" meant equity, then § 522(o) would be superfluous.

Anderson suggests that even if the statute is construed as ambiguous, turning to legislative history supports the bankruptcy court's holding, as Congress intended to eliminate the "mansion loophole" by preventing a person from moving from a state with a limited homestead exemption to one with an unlimited homestead exemption, acquiring ownership in property, and then claiming that property as a homestead when the property has been owned for less than the 1,215 day period. Anderson contends that the legislative history in no way "even hints that 'equity' was what Congress

---

[42]The Fifth Circuit determined that a homestead interest, for purposes of declaring such for exemption under the bankruptcy code,  was not the equivalent of title or equity.  *Id.* at 222.

[43]*Id.* at 221.

was trying to reach" when enacting the statute, but instead, indicates its target was an ownership interest.[44]

Anderson primarily relies on two bankruptcy court decisions, *In re Blair* and *In re Sainlar*, to support his position that the term "interest," as used in § 522(p), refers to title rather than equity. *In re Blair*, a northern district of Texas bankruptcy court decision, involved a debtor who purchased homestead property outside the 1,215-day period prior to filing bankruptcy, but continued to build equity in the property by making regularly monthly mortgage payments during the 1,215-day period.[45]  The bankruptcy court's analysis turned on whether a person can "acquire" equity in property, which it determined that one could not.  The court, however, concluded that one *could* acquire title to property.[46]

To support its conclusion that a person could acquire title but not equity in property, the *Blair* court cited *In re Virissimo*,[47] *In re Wayrynen*,[48] and *In re McNabb*.[49]  These cases, however, do not support the proposition the *Blair* bankruptcy court posits.  Rather than using the term "acquire" to imply that a person could not acquire equity in property, these courts simply used the term to indicate that the monetary cap applies to a debtor who "acquires," or obtains or purchases,

---

[44]Doc. 14, p. 25.  Although Anderson suggests that the legislative history for the statute supports his position, arguments can similarly be made that the legislative history supports an "equity" interpretation.  *See, e.g., In re Reinhard*, 377 B.R. 315, 320-21 (Bankr. N.D. Fla. 2007) (stating language in legislative history imposing aggregate monetary limitation and referring to value indicate the legislature's intent to target equity).

[45]*In re Blair*, 334 B.R. at 375.

[46]*Id.* at 377.

[47]332 B.R. 201 (Bankr. D. Nev. 2005).

[48]332 B.R. 479 (Bankr. S.D. Fla. 2005).

[49]326 B.R. 785 (Bankr. D. Ariz. 2005).

their homes within the 1,215-day period.[50]   Nowhere in these opinions do the courts imply that equity cannot be acquired, and this Court declines to adopt such a narrow interpretation.  The *Blair* court ultimately concluded, based on its determination that one cannot acquire equity, that the term "interest" meant title, and accordingly, because the debtor held title to the homestead prior to the 1,215-day period, the statute did not apply.

In re Sainlar* is a decision from the bankruptcy court of the Middle District of Florida, decided six months prior to, and by a bankruptcy court in the same district, as *Rasmussen*. The sole issue in the case was to determine the meaning of the term "interest" as contained in § 522(p)(1) so the bankruptcy court could decide whether the $125,000 cap applied to equity gained through substantial appreciation of the property during the 1,215 day period.[51]  The debtors purchased their home outside the 1,215-day period, and claimed the house as an exemption upon filing their bankruptcy petition.[52]   The court held that the term "interest" as used in § 522(p)(1) meant acquisition of ownership of real property.[53]   As with  *In re Blair*, the court's analysis turned on whether equity could be "acquired."[54]  The court provided the legal definitions for both "acquired" and "interest," then, without any further analysis or legal authority, concluded that "[t]itle to real property is acquired, equity is not."[55]  Thus, the bankruptcy court determined that § 522(p)(1) applies

---

[50]*In re Blair*, 334 B.R. at 377.

[51]*In re Sandlar*, 344 B.R. at 671.

[52]*Id.* at 670.

[53]*Id.* at 673.

[54]*Id.*

[55]*Id.*

only when a debtor "purchased or otherwise acquired" title to property within the 1,215-day period.[56]

    While not cited by either party, this Court also finds the bankruptcy court's analysis in *In re Reinhard* persuasive.[57]  In *Reinhard*, the court analyzed the meaning of "interest" within § 522(p) to answer the question of whether the acquisition of Florida homestead status alone within the 1,215-day period implicates the statutory cap.[58]  In its analysis, the bankruptcy court found enough ambiguity in § 522(p) so as to require the court to analyze and determine the meaning of the language used by Congress within the statute.[59]

    The court began by looking at the text of the statute to determine Congress' intent.  First, the court noted that the statute refers to "any *amount* of interest," limiting that amount to an "aggregate $125,000 in *value*."[60]  The court concluded the use of such terms, along with use of a specific dollar figure, indicates that "interest" refers to a monetary meaning, or equity, and not simply one of an ownership interest.[61]  Citing Blacks Law Dictionary, the court further found the common, ordinary meaning of "interest" further supports its conclusion, finding that a "debtor must acquire some

---

[56]*Id.* at 674.

[57]377 B.R. 315 (Bankr. N.D. Fla. 2007).  The *Reinhard* opinion was also published after the bankruptcy court's decision in the instant matter.  Again, this Court is cognizant that the factual background and application is not on point with the present matter; however, differing factual scenarios do not alter the meaning of terms within a statute.

[58]*Id.* at 319-21.

[59]*Id.* at 320.

[60]*Id.* (emphasis in original); *see also* 11 U.S.C. § 522(p)(1).

[61]*See Reinhard*, 377 B.R. at 320.

-17-

amount of interest in the value of one of the four types of property listed during the 1,215-day period in order for the cap to apply."[62]

A court may interpret the meaning of terms within a statute one of two ways.  If the statute is unambiguous, the court must interpret the statutory language "according to its plain meaning."[63] This is because the court must presume that the "legislative purpose is reflected by the ordinary meaning of the language used in the statute."[64]  It is a fundamental canon of statutory construction that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[65]  "If the statute's plain language is ambiguous . . . , we look to the legislative history and the underlying public policy of the statute [to determine Congressional intent]."[66]

Section 522(p) prohibits a debtor from exempting "any amount of interest that was acquired by the debtor during the 1215-day period preceding the date of the filing of the petition that exceeds in the aggregate [$125,000] in value."[67]  Rather than isolate any one term within a given section, we must determine the plain meaning of the terms used and then construe those terms within the context

---

[62]*Id.*

[63]*Bowdry v. United Air Lines, Inc.*, 956 F.2d 999, 1002 (10th Cir. 1992).

[64]*Edwards v. Valdez*, 789 F.2d 1477, 1482 (1986) (citing *United States v. Locke*, 471 U.S. 84, 105 S. Ct. 1785, 1793, 85 L. Ed. 2d 64 (1985)); *see also Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) (stating "[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.").

[65]*Davis v. Mich. Dept. of Treasury*, 489 U.S. 803, 809, 109 S. Ct. 1500, 103 L. Ed. 2d 891 (1989).

[66]*Id.* (internal quotation and citation omitted).

[67]11 U.S.C. § 522(p)(1).

with the entire statutory scheme.[68]  Congress did not define the term 'interest' within the statute, so

the Court must turn to the term's common, or ordinary and plain meaning, construing the term in

context of the entire statute.

The statute precludes a debtor from exempting "*any amount* of interest" exceeding "*in the*

*aggregate* $125,000."[69]  "In the aggregate" means "formed by combining into a single whole or

total."[70]  "Amount" implies value, and if Congress had intended to restrict this term to refer to only

title, it would have done so by excluding the "any amount of" phrase preceding the term.  Construing

these terms together only permits this Court to agree with the bankruptcy courts' analysis in *Rogers*,

*Rasmussen*, and *Reinhard*, and conclude that "interest" refers to a quantitative or monetary value -

a concept consistent with equity.

As previously discussed, we are also not convinced that equity cannot be "acquired."  To

"acquire" something means "[t]o gain possession or control of" or "to get or obtain"[71]  Contrary to

Anderson's position, a number of courts have discussed equity as being value that a person *can*

acquire.[72]  We agree, and conclude that one can "acquire" equity in property.

---

[68]"While there is no per se rule of statutory interpretation that identical words used in different parts of the same act are intended to have the same meaning, there is a presumption that this is so."  *Lippoldt v. Cole*, 468 F.3d 1204, 1213 (10th Cir. 2006) (citing *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 214, 121 S. Ct. 1433, 149 L. Ed.2d 401 (2001)).

[69]11 U.S.C. § 522(p)(1).

[70]BLACKS LAW DICTIONARY 72 (8th ed. 2004).

[71]*Id.* at 25.

[72]*See Arevalo v. C.I.R.*, 469 F.3d 436, 439 (5th Cir. 2006) (looking at "not just the passage of bare legal title" but whether the purchaser acquired any equity in the property to determine ownership); *Upham v. C.I.R.*, 923 F.2d 1328, 1334 (8th Cir. 1991) (analyzing transfer of title and acquisition of equity as separate factors indicative of property ownership); *Houchins v. Comm'r of Internal Revenue*, 79 T.C. 570, 591 (1982) (identifying "whether the purchaser acquired any equity in the property" as a factor in determining whether the benefit or burden of property ownership has been transferred); *Benton v. Comm'r*, 1950 WL 7531 (T.C. Sept. 20, 1950) (a renter acquires no equity in property through rent payments).  The Court is cognizant that the cases cited are related to tax law and are

Appellants also argue that interpreting "interest" as "equity" allows a consistent reading of § 522(p)(2)(B), whereas a "title" definition would make it incomprehensible. We agree. Section 522(p)(2)(B) allows an exemption to the homestead cap in that it permits a debtor to transfer "any interest" from the debtor's previous principle residence into the current residence if both residences are located within the same state.[73] As Parks correctly asserts, a person does not transfer title from one residence to another, but instead, transfers equity. The bankruptcy court decisions cited by Anderson either ignores the impact of a "title" definition on § 522(p)2)(B) or provides an explanation that makes no sense. For example, the *Blair* court, in explaining why applying a "title" meaning to the statute is more consistent than applying one of "equity," explains that

> Essentially, [§ 522(p)(2)(B)] allows for rollover by debtors of the equity in one home to another home located in the same state. A debtor is not subject to the homestead cap if he takes the proceeds of his first residence and reinvests them in a second residence even within the prescribed period of section 522(p). [Reading this statute in the context of equity rather than title] would seem at odds with this provision.[74]

The court then proceeded with no further analysis or reasoning to the conclusion that "[if] debtors had sold their home during the 1215 day period and bought another they would be protected. Surely the non-selling debtors should enjoy the same protections."[75]

Equity in a homestead purchased outside the 1,215 day period is an exempt asset under the bankruptcy code, and a homeowner selling that homestead and purchasing another does nothing more than transfer that already-existing exempt asset (equity in the old homestead) into another

---

not factually on-point with the instant matter; however, whether equity can or cannot be "acquired" is not fact driven, and those cases referencing such remains relevant to our analysis.

[73]11 U.S.C. § 522(p)(2).

[74]*In re Blair*, 334 B.R. at 377.

[75]*Id.*

exempt asset (equity into the new homestead).  The homeowner does not lose the exempt status of the equity by transferring the equity of a previous homestead into a new homestead.  However, a homeowner's transfer of  non-exempt funds during the 1,215-day period from, for example, a bank account, into the homestead as exempt equity above the $125,000 cap imposed under § 522(p)(1) is not a protected transfer under the statute.  Permitting the transfer of a non-exempt asset into an exempt asset during the 1,215-day period above the $125,000 cap would run contrary to the plain reading of this section.  Section 522(p) does permit a debtor to transfer funds from a non-exempt asset into homestead equity so long as it does not exceed $125,000 in the aggregate and is not done with fraudulent intent.  Where there is fraudulent intent, § 522(o) may be invoked as a remedy.

Anderson further argues that to allow "interest" to be interpreted as "equity" would make § 522(o) superfluous.  We disagree.  As just stated, § 522(p) permits a debtor to transfer non-exempt assets into a homestead during the 1,215-day period if that transfer is not done with fraudulent intent and if the transfer, in the aggregate, is less than $125,000.  Section 522(o) provides that a transfer of any amount "shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor . . . ."[76]  To impose § 522(o) upon a debtor requires a showing of actual intent of the debtor to hinder or defraud.[77]  Absent actual intent to hinder or defraud, a debtor transferring non-exempt assets to an exempt asset during the 1,215-day

---

[76]11 U.S.C. 522(o).

[77]*In re Carey*, 938 F.2d 1073, 1077 (10th Cir. 1991).

period is protected up to $125,000.[78]  Therefore, we find no conflict between § 522(o) and § 522(p) in applying an "equity" definition to the term "interest."

Accordingly, this Court finds that the term "interest," as used within § 522(p), refers to equity acquired by a debtor within the 1,215-day period prior to filing bankruptcy.  As a result, a debtor may not exempt equity acquired in a homestead during the 1,215-day period prior to filing bankruptcy that exceeds in the aggregate $125,000.[79]  Therefore, we reverse the bankruptcy court's holding on this issue.

### Piercing the Corporate Veil/Alter Ego

Appellant Central Plains claims that the bankruptcy court erred by failing to find that the corporations were Anderson's alter ego, and by refusing to pierce the corporate veil of Anderson's corporations, thereby concluding that Central Plains had no standing as a creditor in the instant action.  The presumption in Kansas is that a corporation and its shareholders are separate and distinct.[80]  When appropriate, "the corporate form will be disregarded and the corporation and its stockholders may be treated as identical."[81]  However, the "[p]ower to pierce the corporate veil is to be exercised reluctantly and cautiously."[82]

The Kansas Supreme Court described the alter ego doctrine as one used to:

impose liability on the individual who uses a corporation merely as an instrumentality to conduct his own personal business. Such liability arises from fraud or injustice perpetrated not on the corporation but on third persons dealing with the

---

[78]*See* 11 U.S.C. § 522(p)(1).

[79]After April 1, 2007, the dollar amount is $136,875.

[80]*Kvassay v. Murray*, 15 Kan. App. 2d 426, 436, 808 P.2d 896, 904 (1991).

[81]*Id.* (quoting *Sampson v. Hunt*, 233 Kan. 572, 579, 665 P.2d 743, 751 (1983)).

[82]*Id.*; *see also Wegerer v. First Commodity Corp. of Boston*, 744 F.2d 719, 729 (10th Cir. 1984).

corporation. Under it the court merely disregards the corporate entity and holds the individual responsible for his acts knowingly and intentionally done in the name of the corporation.[83]

In determining whether to disregard the corporate entity, a court considers eight factors: (1) undercapitalization of a one-man corporation; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) siphoning of corporate funds by the dominant stockholder; (5) nonfunctioning of other officers or directors; (6) absence of corporate records; (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders; and (8) the use of the corporate entity in promoting injustice or fraud.[84]

It is clear that the bankruptcy court, in its analysis of Great Plains' claims, conducted a thorough review of the facts and evaluated those facts against all factors applicable to this case. The bankruptcy court paid particular attention to whether Anderson's actions amounted to the promotion of fraud or injustice, and concluded that based on the record, the court found that his actions did not.[85] Based on its analysis, the bankruptcy court declined to pierce the corporate veil. After this Court's review of the record, we do not find the bankruptcy court's decision to be clearly erroneous and affirm the court's decision. Accordingly, Central Plains has no valid claim against Anderson in his individual capacity or his bankruptcy estate, and is not a creditor in this case.

### Section 522(o) - Intent to hinder, delay, or defraud creditors

Appellants Central Plains and Salina Steel join to appeal this case, claiming that the bankruptcy court erred in finding that Anderson did not act with the intent to hinder, delay, or

---

[83]*Sampson*, 233 Kan. at 579, 655 P.2d at 751.

[84]*Kvassay*, 15 Kan. App. 2d at 437, 808 P.2d at 904.

[85]*Anderson*, 386 B.R. at 326.

defraud his creditors within the meaning of § 522(o) when he transferred $240,000 to pay down his mortgage shortly before filing his bankruptcy petition. However, because Central Plains is not a creditor in this action, its claim is moot. Appellant Parks does not join this issue on appeal.

The bankruptcy court held an evidentiary hearing regarding this matter on November 13, 2007, where it had the opportunity to hear and evaluate the evidence and judge the credibility of witnesses. After the hearing, the court took the matter under advisement.

The burden is on the objecting party to establish by a preponderance of the evidence that the debtor intended to hinder, delay, or defraud his creditors.[86] In applying the facts to the badges of fraud identified under 11 U.S.C. § 727(a) and 11 U.S.C. § 548(a), the court found that Salina Steel demonstrated that three of eight badges of fraud and three of the eleven badges of fraud existed, respectively. In its analysis, the court noted its concern regarding Anderson's response of "I don't know" when asked why he paid down his mortgage instead of his creditors.[87] While the mortgage paydown may have hindered Anderson's creditors and may have been done intentionally, without something more, the bankruptcy court was unable to conclude that Anderson made the transfer with the actual intent to hinder.[88] The bankruptcy court ultimately determined that Salina Steel failed to establish that Anderson had the "actual intent" required under § 522(o) to hinder, delay, or defraud his creditors so as to permit the court to deny discharge.

---

[86]*In re Agnew*, 355 B.R. 276, 284 (Bankr. D. Kan. 2006).

[87]Anderson suggests in his brief that his response is explained by the bankruptcy court's earlier finding that he only has a high school education, minimal credit hours in college, and does not appear to have any formal business or accounting training. He also suffered and continued to suffer from severe depression from being intellectually overwhelmed by the responsibility of dealing with three or four separate entities. Doc. 16, p.22 n.15 (referring to *Anderson*, 386 B.R. at 323).

[88]*Anderson*, 386 B.R. at 331.

After reviewing the record, this Court is convinced that the bankruptcy court's finding that Anderson's actions regarding the transfer of a non-exempt asset to pay down his mortgage was not done with the actual intent to hinder, delay, or defraud his creditors is supported by the evidence and is not clearly erroneous.  Therefore, the Court affirms the bankruptcy court's holding on this issue.

Accordingly,

**IT IS THEREFORE ORDERED** that the bankruptcy court's October 2, 2007 Order denying the trustee's motion for summary judgment and granting summary judgment in favor of debtor is REVERSED and REMANDED to the bankruptcy court for further proceedings consistent with this Order.

**IT IS FURTHER ORDERED** that the bankruptcy court's April 11, 2008 Order is hereby AFFIRMED.

**IT IS SO ORDERED.**

Dated this 19th day of May, 2009, in Wichita, Kansas.


/s Eric F. Melgren
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE